1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **DEANNA LEE BRANDON,** | **1:04-CV-5291 OWW DLB** |
| **Plaintiff,** | **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 25).** |
| **v.** | |
| **RITE AID CORPORATION, INC., et al.,** | |
| **Defendants.** | |

### I.  INTRODUCTION

This is a state-law sex discrimination lawsuit filed by Plaintiff Deanna Lee Brandon ("Plaintiff" or "Brandon") against her former employer Rite Aid Corporation ("Defendant" or "Rite Aid").  Before the court for decision is Rite Aid's motion for summary judgment, or, in the alternative, for summary adjudication of the sufficiency of Plaintiff's evidence concerning punitive damages.  (Doc. 25, filed Oct. 13, 2005.) After oral argument on this motion, Plaintiff was invited to submit supplemental citations to the record.  (Doc. 44, filed Nov. 14, 2005.)  This supplemental filing, along with Defendant's response (Doc. 45, filed Nov. 15, 2005), have been fully considered.

1

## II.   **PROCEDURAL HISTORY**

Brandon filed suit against Rite Aid in the Superior Court for the County of Kern on December 24, 2003. (Doc. 1, Ex. A.) On February 13, 2004, Rite Aid removed on the basis of diversity jurisdiction. (Doc. 1.) Brandon's first cause of action alleges "[d]iscipline, [d]emotion and [t]ermination in violation public policy." (Compl. at ¶¶8-14). The second cause of action alleges retaliation.

Defendant moved to dismiss the complaint. (Doc. 7, filed Feb. 20, 2004.) In a March 31, 2004 order, Plaintiff's first cause of action was construed "to only state the claim that she was subjected to sex discrimination." (Doc. 12 at 10.) (The district court rejected several other public policy grounds advanced by Plaintiff.) The district court also specifically found that Plaintiff "can claim wrongful discharge, but not wrongful discipline." (*Id*. at 6.) Plaintiff was afforded an opportunity to amend, (*id*. at 10), but did not do so. Plaintiff now appears to once again advance claims based upon wrongful discipline. These claims were dismissed and will not be considered.[1]

---

[1]   The court's March 31, 2004 order is arguably ambiguous as to the continued viability of the wrongful discipline claims. However, in two subsequent joint reports filed by the parties, the theory of Plaintiff's case is clearly confined to wrongful termination:

> Plaintiff's theory in this lawsuit is that Rite Aid wrongfully terminated her in violation of public policy and retaliation for filing a complaint with the DFEH, and that the reasons Rite Aid gave for her termination -- insubordination and violation of company policy --

**2**

1    Defendant now moves for summary judgment on Plaintiff's

2   remaining claims, or, in the alternative, for summary

3   adjudication that Plaintiff has adduced no evidence to support

4   her claim for punitive damages.  (Doc. 25.)  Plaintiff opposes,

5   but filed her opposition one day late.  (Doc. 39, filed Nov. 11,

6   2005).  Defendant filed a reply, in which it argues, among other

7   things, that Plaintiff's late-filed opposition should not be

8   considered.  (Doc. 40, filed Nov. 7, 2005.)

9    Plaintiff's counsel filed a declaration explaining that the

10  opposition was late-filed due to a clerical error by his office

11  staff.  (Doc. 42, filed Nov. 7, 2005.)  Plaintiff offered to

12  postpone the hearing if the late-filing would prejudice

13  Defendant.  (*Id.*)  Defendant did not express interest in

14  postponing the hearing.  Leave of court to late file is routinely

15  granted under such circumstances.  *See, e.g., Udom v. Fonseca,*

16  846 F.2d 1236, 1238 (9tn Cir. 1988)(a district court can abuse

17  its discretion in failing to give plaintiff the opportunity to

18  file a document a few days late where delay was "plainly not

19  occasioned by neglect or disrespect for the court.")  There is no

20  danger of delay or prejudice here.  The opposition will be

21  considered.

22  //

23  //

24  //

25  

26    constitutes a retaliatory and wrongful termination.

27  (Doc. 15, Joint Scheduling Report, filed June 24, 2004; Doc. 14,
    Joint Status Report, filed June 4, 2004.)  Plaintiffs cannot now

28  revive their wrongful discipline claims.

**3**

### III.  **FACTUAL BACKGROUND**

Plaintiff was employed by Rite Aid for approximately eight years prior to her suspension in September 2002 and eventual termination in December 2003.  (Deft's Stmt. of Undisputed Facts, Doc. 26, ("UF") #1 & #10.)  As of April 2002, Brandon was the manager of Rite Aid's "Marketplace" store in Bakersfield, California.  (UF #3.)

### A.  **Rite Aid's District Manager learns of Brandon's Second Job**.

In April 2002, two supervisors from the Marketplace store, Susan Macias and Caroline Subia, contacted Rite Aid District Manager Ross Boesch to complain that Brandon was not showing up for her scheduled shifts.  (UF #4.[2])  Boesch spoke with Brandon about the complaints and learned that Brandon was working a second job one day a week.  (UF #6.)  Brandon assured Boesch that her post office job would not interfere with her responsibilities as a Rite Aid manager.  (UF #7.)  Boesch insisted that Brandon quit her post office job.  (UF #8.)  Brandon did not quit her post office job and remained employed there at the time of her termination.  (UF #9.)

//

//

---

[2]  Plaintiff objects to the court's consideration of this fact, supported by the Declaration of Ross Boesch, on the ground that it is hearsay.  It is not offered for the truth of the matter asserted (that Brandon was not showing up for work) but rather for the effect on the listener (Boesch), and is therefore admissible.  Fed. R. Evid. 801.

1       **B.**    **The Shoplifter Chase**.

2      Rite aid has a "hands-off" loss prevention policy regarding

3 shoplifters. Pursuant to this policy, a Rite Aid employee may

4 not chase after a shoplifter in an effort to retrieve stolen

5 merchandise. (UF #10 & #11.) Instead, Rite Aid employees are

6 supposed to gather information about a suspected shoplifter, such

7 as a license plate number. (UF #23.)

8      On September 10, 2002, while Brandon and Caroline Subia were

9 off duty and at home, Susan Macias, a shift supervisor, called

10 Caroline Subia, a supervisor, to inform Subia that another

11 employee named Ian had placed bottles of alcohol from the store

12 outside the back door, presumably to be picked up later. (UF #12

13 & 13.) Subia called Brandon at home to inform her of Ian's

14 conduct. (UF #12.) Brandon went to the store with her husband

15 to observe the back of the store. (UF #14.) Subia also drove to

16 the store with her husband to do the same. (UF #15.) Subia and

17 Brandon got out of their cars and observed the liquor bottles in

18 the dumpster. (UF #16.) Approximately 15 minutes later, a truck

19 drove around to the back of the store, Ian got out of it, picked

20 up the bottles from the dumpster, and got back in the truck. (UF

21 #17.) Brandon yelled at Ian, "give me the alcohol." (UF #18.)

22 Ian did not respond. Instead, he got back into his truck and

23 drove off. (UF #19.) Subia departed the area to follow Ian.

24 Brandon followed the two cars. (UF #20.) Ian eventually pulled

25 over. (UF #20.)

26      The next day, Brandon sent an internal Rite Aid e-mail

27 message to Rite Aid management, summarizing the events and her

28 actions from the night before. (UF #21.) Brandon also spoke

**5**

with Chuck Vega, Rite Aid's Loss Prevention Manager, about the
incident.  (UF #22.)  Before the incident with Ian, Brandon had
never followed a customer or employee suspected of shoplifting
out of the store.  (UF #24.)  Brandon admitted that Subia
violated the Rite Aid policy by following Ian out of the parking
lot in her car.  (UF #25.)  After an investigation, Rite Aid
determined that Brandon also violated Rite Aid policy regarding
shoplifters and had exercised very poor judgment in following
Ian.  (UF #26.[3])  Rite Aid concluded that Brandon's conduct had
put her own safety and the safety of the public and her employees
in jeopardy.  (UF #27.)

The following individuals were involved in a discussion
concerning the appropriate discipline for Brandon following this
incident:  Rite Aid's Regional Vice President, Kevin Houston;
Ross Boesch; Human Resources Manager, Daniel Pina; and Rite Aid's
Loss Prevention Manager, Chuck Vega. (UF #29.)  Boesch, Vega, and
Pina recommended to Houston that Brandon be terminated.  (UF
#30.)  Instead, Houston decided to suspend Brandon.  (UF #31.)
Although Houston believed Brandon exercised poor judgment, he
believed that Brandon was looking out for the company's assets.
(UF #32.)  Subia was also suspended.

Houston and Boesch also felt that Brandon had become too
close to the employees at the Marketplace store and that this

---

[3]   Brandon objects to UF #26 and 27 on the ground that it
lacks foundation and is an impermissible conclusion/opinion.
But, again, this statement is not being offered for the accuracy
of Rite Aid's conclusions.  Rather, it is offered only to show
that Rite Aid reached such a conclusion.  It is therefore
admissible.

1  interfered with her judgment.  (UF #36.[4])  As a result, Brandon

2  was transferred to a different store on Allen Road in

3  Bakersfield.  (UF #35.)

4      **C.   Form 30 Misuse.**

5      In late October 2002, after Brandon was transferred to the

6  Allen Road store, the Marketplace store began to prepare for an

7  inventory.  (UF #37.)  Boesch, who was on site at the time,

8  observed Susan Macias inventorying empty boxes. (UF #38.)  The

9  boxes were empty, because the enclosed merchandise had been

10 "stolen or pilfered."  (UF #39.)  Macias was using "Rite Aid Form

11 30 procedures" to inventory the boxes.

12      Form 30s are documents created at the cash register when

13 items are discounted below the regular selling price.  (UF #40.)

14 Such discounts are appropriately used to account for "employee

15 discounts, rain checks, price modifications when a sale price

16 fails to ring up, and in-store use of merchandise."  (UF #41).

17 Rite Aid policy provides that the Form 30 procedure is <u>not</u>

18 supposed to be used to account for empty boxes or other

19 "pilfered" merchandise.  (UF #42.)  Instead, empty boxes and

20 pilfered merchandise should be rung up as "shrink" or "loss" via

21 a different procedure.  By using the Form 30 procedure, the

22 merchandise is rung up at $0.00, which has the effect of not

23 reporting lost merchandise as "shrink."  "Rite Aid considers a

24 true shrink calculation to be an important figure, as shrink may

25 _____

26      [4]   Plaintiff again objects to the court's consideration of
   this fact on the ground that it is an impermissible

27 conclusion/opinion.  Again, as this fact is not offered for the
   truth of the matter asserted, this objection is not grounds for a

28 finding that this fact is inadmissible.

1  negatively affect the store manager's bonus." (UF #44.) "Rite

2  Aid considers intentional manipulation of a store's shrink figure

3  to be fraudulent." (UF #45.)

4      The then-current manager of the Marketplace store denied

5  instructing employees to use Form 30 procedures for "shrink."

6  (UF #48.)  Macias said that Brandon had instructed her to use

7  Form 30 procedures in this manner.  (UF #50.)  Brandon denied

8  doing this.  Instead, Brandon asserts that <u>she</u> caught <u>Macias</u>

9  misusing the Form 30 procedures in the past and had reminded her

10  of the correct procedure.  (UF #51 & #52.)  Rite Aid concluded

11  that Brandon had failed to adequately supervise Macias by failing

12  to confirm compliance with company policy.  (UF # 53.)  Houston

13  decided to suspend Brandon again for failure to properly

14  supervise.  (UF #54.)  Macias received a written warning.  (UF

15  #55.)

16      **D.  <u>Alleged Holiday Workweek Policy Violations</u>**.

17      It is undisputed that in December 2002, because of the busy

18  holiday season, Rite Aid required its store managers to work six

19  days a week.  Rite Aid maintains that this "holiday workweek"

20  policy required managers to work <u>ten hours per day</u> on all six

21  days.  (*See* UF #59.)  Rite Aid documents attached to the

22  Declaration of Joshua Henderson at Exhibit A, confirm the six day

23  per week requirement, but <u>say nothing about the ten hour per day</u>

24  <u>requirement</u>.  Rite Aid's witnesses attest to the existence of the

25  ten hour per day requirement, however.

26      Brandon disputes the existence of a policy requiring store

27  managers tot work ten hours per day, six days per week, and

28  maintains that, in practice, the policy was more flexible.

**8**

1  Brandon believed that as long as managers checked up on their

2  store regularly and worked at least a few hours six days per

3  week, that was enough.  (Brandon Depo. at 264.)  Brandon claims

4  that it was Ross Boesch who explained this flexible policy to

5  her.  (*Id.*)

6  Brandon concedes that there were days in December 2002 when

7  she was scheduled to work but did not work ten hours.  (UF #60.)

8  On December 20, 2002, Boesch went to Brandon's Allen Road store

9  for a random walk through, a routine occurrence.  (UF #56 & #61.)

10  Brandon was not there.  (UF #62.)  An assistant manager informed

11  Boesch that Brandon was scheduled to work only a brief shift that

12  evening.  (UF #63.[5])  Brandon wrote her own schedule and

13  scheduled herself to work from 7:00 p.m. to 9:00 p.m. on December

14  20.  (UF #64.)

15  Rite Aid considers it critical for a store manager to

16  schedule a full shift and show up consistently, as this

17  establishes credibility and accountability with other employees.

18  (UF #66.)  Boesch informed Pina that Brandon's schedule did not

19  comply with Rite Aid's purported six day/10 hours per day holiday

20  workweel policy.  (UF #67.)  Pina called Brandon to discuss her

21  compliance and to explain the policy.  Brandon attempted to

22  explain why she was not there, but Pina cut her off.  (UF #68;

23  Brandon Depo at 254-56.)  Rite Aid asserts that Pina warned

24  Brandon that continued non-compliance with the workweek policy

25

26       [5]  Here, Plaintiff again advances the objection that this

27  fact is an impermissible conclusion/opinion.  As explained *supra*
   in note 5, this objection is not grounds for a finding that this

28  fact is disputed.

**9**

1  would result in discipline and possibly termination.  (UF #69.)

2       Boesch returned on December 21, 2002 to do the walk-through.

3  (UF #70.)  Brandon was present, but went home after a half an

4  hour, complaining of a migraine.  (UF #71.)  Boesch looked at her

5  schedule for the week and saw that Brandon <u>had scheduled herself</u>

6  <u>for only two hours a day on three of her six work days</u>.  On

7  December 23, 2002, Boesch called the Allen Road store and

8  discovered that Brandon was not there during her scheduled work

9  time.  (UF #73.)  An assistant manager told Boesch that Brandon

10  came in for less than an hour that morning and told the employees

11  she was going to do some shopping and then was going to the

12  Marketplace store to pick up merchandise.  (UF #74.)  Boesch left

13  messages for Brandon to call him when she arrived at the

14  marketplace store.  Brandon never returned Boesch's calls.  At

15  7:00 p.m. that night, a supervisor from the Marketplace store

16  informed Boesch that Brandon had arrived.  (UF #77.)  Boesch

17  called Vega and told Vega to meet him at the Marketplace store to

18  talk to Brandon.  (UF #78.)  When confronted, Brandon admitted

19  that she had been Christmas shopping for her children and had

20  worked a several hours at the post office.  (UF #79.)  Boesch

21  told Brandon that she was suspended.  (UF #80.)

22       Boesch and Pina then consulted with Houston about Brandon's

23  conduct.  On December 27, 2002, Houston made the decision to

24  terminate Brandon.  (UF #83 and #84.)  Specifically, Houston

25  concluded that Brandon continued to violate the workweek policy,

26  despite having been warned; was insubordinate for failing to

27  follow her supervisors' orders concerning the workweek policy;

28  and that her conduct constituted time fraud because she was

1  drawing salary from the post office at the same time she should

2  have been working at Rite Aid.  (UF #84 & #85.)

3       **E.   Dscipline of Others by Rite Aid**.

4       Brandon asserts that another male manager, who oversaw the

5  Marketplace store prior to Brandon, had an unaccounted $35,000

6  merchandise loss, but was not disciplined.  (UF #91.)  Brandon

7  admits that she does not know whether this manager (Jim Crabtree)

8  was responsible for the $35,000 loss.  (UF #92.)

9       Brandon also believes that other male managers were involved

10 with Form 30 irregularities but were not disciplined.

11 (Plaintiff's Stmt. of Undisputed and Disputed Fact, Doc. 37,

12 ("PUF") #2.)  Brandon testified that while she was at the

13 Marketplace store, she discovered some irregularities in

14 inventory paperwork prepared by Jim Crabtree.  She informed

15 Boesch of her discovery, but Boesch did not take any action to

16 address the problem.  Brandon does not clearly explain the nature

17 of these irregularities nor does she provide details about

18 accounting violations by any other employee.

19      Brandon asserts that Boesch yelled at her on occasion (UF

20 #94.), but also admits that Boesch yelled at male managers (UF

21 #96).  However, Brandon contends that Boesch would turn "bright

22 red" when yelling at <u>her</u>, but not when yelling at the male

23 managers.  (UF #97.)  Brandon asserts that three male managers

24 and a female manager felt mistreated by Boesch too, but does not

25 recall any details about their complaints nor does she explain

26 how she is competent to provide a foundation for such hearsay.

27 (UF #95.)

28      Brandon does not have personal knowledge of any other Rite

**11**

1 | Aid manager who pursued a shoplifter outside a store. (UF #93.)

2 |      Finally, Kent McCoy, another (male) Rite Aid manager, also

3 | held a second job. A few weeks prior to December 2002, Boesch

4 | counseled McCoy about making Rite Aid a priority and not letting

5 | his second job interfere. On December 3, 2002, Boesch issued

6 | McCoy a written warning for not working his posted schedule. (UF

7 | #88.) Boech was not aware of any further problems with McCoy.

8 |      **F.**   **Brandon's Administrative Complaint**.

9 |      Brandon filed a charge of sex discrimination with the

10 | California Department of Fair Employment and Housing ("DFEH") on

11 | December 5, 2005. (PUF #3.) The charge was mailed to Pina on

12 | December 6, 2005. Within three weeks of filing the charge,

13 | Brandon was suspended and ultimately terminated. (*Id.*)

14 | Thereafter, Brandon filed an amended claim of discrimination.

15 | (PUF #4.)

16

17 |            **IV.**   **STANDARD OF REVIEW**

18 |      Summary judgment is proper "if the pleadings, depositions,

19 | answers to interrogatories, and admissions on file, together with

20 | the affidavits, if any, show that there is no genuine issue as to

21 | any material fact and that the moving party is entitled to a

22 | judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving

23 | party bears the initial burden of demonstrating an absence of

24 | genuine issues of material fact. *See Celotex Corp. v. Catrett*,

25 | 477 U.S. 317, 323 (1986). However, where the non-moving party

26 | has the burden of proof at trial, the moving party need only

27 | demonstrate an absence of evidence to support the claim or

28 | defense asserted by the non-moving party. *See Id*. at 325.

**12**

Once the moving party has met its initial burden, the non-moving party must then designate specific facts showing that there is a genuine issue for trial. *Id*. at 324. "The mere existence of scintilla of evidence [is] insufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## V.   DISCUSSION

### A.   Termination in Violation of Public Policy.

In discriminatory termination claims, California courts apply the familiar burden shifting approach established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). *See Trop v. Sony Pictures Entertainment, Inc.*, 129 Cal. App. 4th 1133, 1144 (2005); *see also Guz v. Bechtel Nat. Inc.,* 24 Cal. 4th 317, 354 (2000) ("Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes.").

Under the *McDonnell Douglas* approach, Plaintiff must first establish the elements of a prima facie claim.

> This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled. While the plaintiff's prima facie burden is not onerous, he must at least show  actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a prohibited discriminatory criterion.

*Guz*, 24 Cal. 4th at 354 (internal citations and quotations

omitted).

The specific elements of a prima facie case vary, depending on the particular facts and circumstances of a case.  Citing *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054 (9th Cir. 2002), defendant argues that Plaintiff should be required to prove:

    (1)  she belongs to a protected class;

    (2)  she was qualified for the position;

    (3)  she was subjected to an adverse employment action; and

    (4)  similarly situated men were treated more favorably, or her position was filled by a man.

281 F.3d at 1062.  But this is not the only valid formulation of the prima facie test.  In discriminatory termination cases, California courts often apply a more broadly-worded formulation that requires Plaintiff to establish:

    (1)  she was a member of a protected class,

    (2)  she was qualified for the position he sought or was performing competently in the position he held,

    (3)  she suffered an adverse employment action, such as termination, demotion, or denial of an available job, and

    (4)  <u>some other circumstance suggests discriminatory motive</u>.

*Guz*, 24 Cal. 4th at 355 (emphasis added).  The burden of proof is not onerous: "the requisite degree of proof necessary to establish a prima facie case for Title VII...on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence."  *Id*.

If Plaintiff is able to establish a prima facie case, the analysis continues:

> Establishment of the prima facie case creates a rebuttable presumption that the employer unlawfully discriminated against the employee. The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's [termination]. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.

*Mixon*, 192 Cal. App. 3d at 1318-19 (citing *Texas Dept. of Comty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  However, the burden does not shift back to the employee until the employer shows that the policy by which the employee was terminated was "validly and fairly devised and administered to serve a legitimate business purpose."  *Cal. Fair Employment and Housing Comm'n v. Gemini Aluminum Corp.*, 122 Cal. App. 4th 1004, 1022 (2004).

If defendant provides evidence showing a legitimate non-discriminatory reason for the termination:

> [T]he presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity....Plaintiff now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. [She] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.  This burden now merges with plaintiff's ultimate burden of persuading the court that [she] has

**15**

been the victim of intentional discrimination.  At this stage, the *McDonnell/Burdine* presumption "drops from the case" and the factfinder must decide upon all of the evidence before it whether defendant intentionally discriminated against plaintiff.  *In short the trier of fact decides whether it believes the employer's explanation of its actions or the employee's.  While a complainant need not prove that racial animus was the sole motivation behind the challenged action, [she] must prove by a preponderance of the evidence that there was a "causal connection" between the employee's protected status and the adverse employment decision*.

*Id*. (internal citations and quotations omitted); *see also Villarimo*, 281 F.3d at 1062.

### 1.   Prima Facie Case.

There are several formulations of the prima facie test.  The one that is most often applied in California, however, requires that Plaintiff show (1) she belongs to a protected class; (2) she was performing competently in the position he held; (3) she suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive.

Plaintiff's membership in a protected class is not disputed, nor is it disputed that she was terminated and that the termination constituted an adverse employment action.  Defendant does maintain, however, that Plaintiff cannot satisfy the second or fourth elements.

**16**

### a.   *Brandon's Job Performance*

Defendant argues that Brandon's job performance was not adequate.  It is not disputed that there were some days in December 2002 when Brandon was scheduled to work, but did not work ten hours.  It is also undisputed that Brandon only worked two and one-half hours on December 20, 2002, and that she had scheduled herself to work only two hours a day, three out of her six work days that week.  (UF #72.)  Finally, Brandon does not dispute that she only showed up to work for a few hours on December 23, 2002 and that she spent several hours working at her second job at the post office that day.  Critically, however, there <u>is a factual dispute</u> as to whether any of this conduct violated company policy.

The inquiry begins with Rite Aid's evidence concerning its own workplace policy.  The workplace policy is addressed in three documents, all of which are attached to the Declaration of Joshua M. Henderson, Doc. 27, at Exhibit A.  First, a September 12, 2000 memorandum from Mary Sammons to "All Store and Regional Management Personnel" concerning the topic of "Workweek."  This memorandum announces that Rite Aid is "abolishing the requirement that a manager work a 6-day workweek...effective immediately."  However, the memorandum also highlights that there is one exception to this new workweek policy:

**17**

> [D]uring the period from Thanksgiving until the Sunday
> following New Year's, it <u>will be required that all
> store and field personnel work 6 days per week</u> to
> maximize superior customer service during the critical
> holiday season.  However, all management personnel are
> required to have a day off each week during this
> period.

(*Id.*, Attch. A, Ex. 8 (emphasis added).)  Critically, this

memorandum <u>says nothing about the number of hours that each</u>

<u>management employee must work on each of the six days they are</u>

<u>scheduled to work each week</u>.

The Second document is a September 7, 2001 bulletin, from

Mark Panzer, Executive Vice President of Store Operations, to

"All Store Management Associates."  This document sets forth the

general rules concerning the normally operational five-day

workweek.  It explains:

> The exception to our workweek policy is the period from
> Thanksgiving until the Sunday following New Year's Day.
> It is required that all salaried store and field
> associates work a 6-day workweek to maximize superior
> customer service during the critical holiday season.
> However, all management associates are required to have
> a day off each week during this period.

(*Id.*, Attch. A, Ex. 9.)  Again, <u>this document says nothing about</u>

<u>the number of hours a store manager must work each day during a</u>

<u>six-day workweek</u>.

Finally, on August 15, 2001, Mark Panzer sent a memorandum

to "All Field Associates" on the subject of "Management

Workweek."  This document explains:

**18**

As we approach the critical holiday selling season, it is important that we not only staff the front end and pharmacy correctly using the StaffWorks scheduling tools, but we must also schedule our management personnel to improve overall customer service and total store supervision.

In order to accomplish our goals of increasing overall customer service and store supervision, we are redefining our store management scheduling requirements.  Outlined below are the revised management workweek standards that all store management teams will be required to meed beginning with week 31 or week ending 10/06/01.

- All Store Managers are required to schedule themselves to work every other Saturday.

- All Store Managers are required to work at least one Sunday per month

- All Store Managers are required to work at least one night per week until closing or 10:00 PM in 24-Hour stores.

- Assistant Managers should be scheduled no more than three nights per week, with a minimum of two nights.

- Assistant Managers are to have one weekend off per month.

- The Store Manager and Assistant Managers are to rotate working holidays.

- A 6-day workweek is only to be used during the period from Thanksgiving until the Sunday following New Year's.  All management personnel must be scheduled a day off each week during this period.

Regional Management personnel will be required to schedule their time to permit frequent visits to stores to view operating conditions on weekends and nights.

We cannot fulfill our commitment to providing superior customer service and store supervision without proper scheduling.  The standards outlined above will be effective with week 31 (week ending 10/06/01).  All Store Teams are to follow these standards.  The above standards should not only improve customer service but they will also ensure that our associates receive proper supervision, training and support.

\* \* \*

**19**

(*Id.*, Attch. A, Ex. 10.)  Again, <u>nothing in this memorandum</u> <u>states that management personnel are supposed to work ten hours</u> <u>per day during the six-day holiday workweek</u>.

Defendant asserts that Plaintiff has admitted that company policy required managers to work six days a week, ten hours per day during the holidays, pointing to Plaintiffs response to one of Rite Aid's requests for admission.  The request for admission to which Rite Aid refers provides:

> Prior to your termination, it was explained to you by someone at Rite Aid that Rite Aid's holiday workweek policy requirement that 'all salaried store and field associates work a 6-day workweek' meant that you were required to work ten hour shifts, six days a week for the period from Thanksgiving until the Sunday following New Year's Day.

(Defendant's Second Set of Requests for Admissions, ("RFA") #20, attached to Henderson Decl., at Ex. A.)  Plaintiff did admit to this.  (*See* Response to RFA #20, attached to Henderson Decl., at Ex. B.)  But this admission is not broad enough to preclude the existence of a dispute.  Plaintiff merely admitted that someone at Rite Aid <u>had informed her</u> that the workweek policy included a requirement that she work ten hours per week.  This is not an admission that Rite Aid policy <u>did in fact require</u> her to work six ten-hour shifts, an assertion Plaintiff disputed at her deposition.

//

**20**

Q:  ...Did you have any questions of Mr. Boesch regarding the workweek policy at that [district] meeting?

A:  No.  But I will say at these meetings from time to time when Ross would refer to the work schedule and the holiday schedule, he would say, "In other words, if you want to take different days off," or "If you want to show up, just check and make sure the store is okay and then go home, that's okay, and come back."  He has said that on more than one occasion.

Q:  Did he ever indicate that it was okay not to work six days a week, 10-hour days?

A:  Did he ever say it's not okay?

Q:  Yes.

A:  He's told me I work too much and I need to go home or I would be fired.

Q:  But during the holiday workweek, did Mr. Boesch ever tell you that it was okay not to work six full days?

A:  I don't recall

Q:  Coming back to what you just said.  Can you explain a little bit more or can you remember anything more about what Ross said about showing up at work and making sure everything is okay.  I just wanted to follow up on that line of thought.

A:  When we would have district meetings, because we would work very long periods of time.  And it wasn't just 10 hours a day.  It was much longer.  I wasn't the only manager.  A lot of time that's what you needed to do to get the store complete.

    And from time to time, Rite Aid would change their procedure exactly -- they want you to work this many days or swap weekends or what-have-you.  And there has been more than several times where Ross has said, "You can go in and show up on the sixth day, work a little bit, couple hours, make sure everything is all right and go home."

    At district meetings, he has said that on more than one occasion

Q:  Was that in reference to a holiday workweek, or was that in reference to any week other than the holiday workweek?

A:  Holidaytime he has said that, as well.

Q:  When did he say that?

**21**

A:    I don't remember the exact date.  But it's <u>on -- more
      than once he has said that</u>.

(Brandon Depo. at 262-64.)

Rite Aid points to another portion of Brandon's deposition
where Brandon admits that, two weeks prior to her suspension, she
discussed the workweek policy with Daniel Pina:

Q:    Did you have any conversations with Mr. Pina before the
      day that you were suspended in December of 2002?
A:    I believe maybe a week before or two
Q:    Was anyone else present during that conversation
      besides you and Daniel?
A:    Maybe Ross.  But I don't recall exactly.
Q:    Was it an in-person conference, or was it over the
      telephone?
A:    Telephone.
Q:    Did Daniel tell you what the workweek policy was?
A:    During that conversation, he had talked to me about it.
      He wanted to know where I was at.  And I told him where
      I was at.

(*Id.* at 254.)  Again, Rite Aid tries to stretch the import of
these comments.  Nothing in this excerpt (or any other part of
Ms. Brandon's Deposition) constitutes either an admission that
Rite Aid had a six day/10 hour per day holiday workweek or an
admission that Brandon violated Rite Aid's workweek policies.
Although several of Rite Aid's witnesses confirm that the
workweek policy included a requirement that managers work ten
hour shifts six days a week, in the absence of an express written
policy, Brandon's testimony is sufficient to create a genuine

issue of fact as to the substance of Rite Aid's workweek policy.

If Rite Aid's actual policy was, as Brandon describes it, that

managers had to show up at their stores six days a week to check

in but did not necessarily need to work ten hours a day all six

days, Brandon's conduct arguably did not violate company policy.

Although it is undisputed that Brandon worked two and one-half

hours on December 20, 2002, that she showed up to work for a few

hours on December 23, 2002, and that she spent several hours

working her second job at the post office on December 23, viewing

the evidence concerning Rite Aid's holiday workweek policy in a

light most favorable to Plaintiff, there is a dispute as to

whether this alleged absenteeism constitutes poor performance.[6]

### b.   Other Circumstances Suggestive of Discriminatory Motive.

Defendants also assert that Plaintiff has failed to present

any evidence, circumstantial or otherwise, tending to suggest

that her termination was motivated by discriminatory intent.

Defendants maintain that Plaintiff has no evidence that any

similarly situated male employee was treated differently from

her.  Plaintiff points to three incidents in which she believes

that male employees were treated differently under similar

---

[6]    Rite Aid argues as though the workweek six day/10 hour
per day policy is established fact.  For the purposes of this
summary judgment motion, the alleged policy is disputed and
whether such a policy existed must be decided by the trier of
fact.

circumstances.  She offers no other circumstantial evidence of discriminatory motive.

First, Brandon asserts that another male manager, Jim Crabtree, who oversaw the Marketplace store prior to Brandon, had an unaccounted $35,000 merchandise loss, but was not disciplined. (UF #91.)  Brandon admits, however, that she does not know whether Crabtree was responsible for the missing merchandise (UF #92.)  Chuck Vega apparently told Brandon that Rite Aid suspected Crabtree, but could not prove it.  (Brandon Depo. at 233.)   But, Brandon also admits that Rite Aid did place the blame for the loss on another male employee (i.e., not Crabtree).  (*Id*. at 232.)  This is uncorroborated double hearsay from Vega through Plaintiff.

Second, Brandon asserts that Jim Crabtree was involved with some other form of inventory irregularity at the Marketplace store.  When Brandon discovered the irregularity, she pointed it out to Boesch, but Boesch did nothing in response.  (Brandon Depo. at 244-49; PUF #2.)

Finally, Brandon asserts that Boesch yelled at her on occasion, (UF #94.), but also admits that Boesch yelled at male managers too, (UF #96).  However, Brandon contends that Boesch would turn "bright red" when yelling at her, but not when yelling at the male managers.  (UF #97.)

**24**

Rite Aid responds by highlighting the disciplinary approach it took toward Kent McCoy, the male manager who also held a second job in December 2002.  Boesch sent a written warning to McCoy on December 3, 2002 for not working his posted schedule. (UF #88.)  Boech was not aware of any further problems with McCoy. (UF #90.)

As a threshold matter, none of the incidents highlighted by Brandon are comparable to the alleged workweek schedule misconduct that ultimately led to Brandon's <u>termination</u>.[7] Rather, the examples cited by Brandon are somewhat parallel to the types of conduct that led Rite Aid to <u>discipline</u> Brandon prior to December 2002.  Brandon did not oppose dismissal of her discriminatory discipline claims and she has neither alleged nor adduced evidence for a hostile work environment claim.  (*See* Doc. 12 at 13.)  Nevertheless, even absent such claims, it is appropriate to look to prior events for evidence of an unconstitutional motive.  *See R.K. Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1062 (9th Cir. 2002).

Brandon still must establish that she and the males involved in these comparator incidents are "similarly situated."  To be deemed "similarly-situated," the comparator must "engage in

---

[7]    The discipline of Kent McCoy is comparable to Brandon's situation, but Brandon does not argue that he was treated differently from her.

25

problematic conduct of comparable seriousness" to the plaintiff. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 n.2 (9th Cir. 2004)(finding plaintiff, who intentionally disobeyed a direct order from a superior, was not similarly situated to an individual who did not know he was disobeying a direct order).

Turning to the facts of this case, Brandon's suggestion that Boesch yelled at her with more fury than he exhibited toward male employees is not probative.  She has not explained the reason that Boesch was yelling at the male employees and therefore cannot establish that those incidents are comparable to her own encounters with Boesch.

The evidence concerning Jim Crabtree presents a more difficult question.  Plaintiff has not established that Jim Crabree engaged in comparable conduct with respect to the $35,000.00 in merchandise that went missing on his watch. Brandon does not know how the loss occurred, nor has she established that Rite Aid believed Crabtree was responsible or at fault for the loss.

However, Brandon also alleges that she personally discovered Form 30 inventory irregularities that occurred at the Marketplace store on Crabtree's watch.  Brandon acknowledges that she did not observe Crabtree misusing the Form 30 process, but that she discovered some paperwork that suggested he had done so. (Brandon Depo. at 245.)  Brandon's description of these

irregularities is confusing, but it is relatively clear that she associated this paperwork with Form 30 irregularities.  Brandon brought this to the attention of Ross Boesch, but he "just brushed [it] off." (*Id*. at 246:16.)  Viewing this evidence in a light most favorable to Brandon, it appears that another male manager may have misused the Form 30 process, but the violation was apparently ignored.  Brandon, on the other hand, was disciplined for failing to properly ensure that her staff was utilizing the Form 30 process appropriately.  This evidence marginally establishes a prima facie case, because "[t]he requisite degree of proof necessary to establish a prima facie case...on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. JR. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

### 2.   Legitimate Non-Discriminatory Reason for Termination.

Rite Aid contends that it had a legitimate, non-discriminatory reason for terminating Brandon.  Specifically, Rite Aid asserts that Brandon's conduct in December 2002 was insubordinate; violated the company workweek policy; and constituted time fraud.  However, all three of these bases for termination turn on the validity of Rite Aid's stated workweek policy.  Assuming the truth of <u>Brandon's</u> understanding of Rite Aid's holiday workweek policy for store managers, Brandon's

27

conduct arguably did not violate the policy.

The burden does not shift back to Brandon until Rite Aid shows "that the procedure by which the employee was terminated was validly and fairly devised and administered to serve a legitimate business purpose." *See Gemini Aluminum*, 122 Cal. App. 4th at 1022.  As discussed above, supra at Part V.A.1.a, there are factual disputes as to the very existence of a company policy that specifically required managers to work six days a week, ten hours per day.  Therefore, viewing this disputed fact in a light most favorable to Plaintiff, the inference follows that Rite Aid <u>had no such policy</u>.  For the purposes of this motion, Rite Aid has not demonstrated the existence of a legitimate non-discriminatory reason for Brandon's termination.

### 3.    Plaintiff's Showing of Pretext.

Because Rite Aid has failed to satisfy its burden of proof as to a legitimate non-discriminatory reason for Brandon's termination, Brandon is not required to establish pretext in order to survive this motion for summary judgment.  But, even if the burden did shift back to Brandon, she could establish pretext by showing "that the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate discharge." *Gemini Aluminum,* 122 Cal. App. 4th at 1023.  While "an inference of intentional discrimination cannot be drawn solely from evidence

**28**

showing the employer to be unworthy of credence, it is
circumstantial evidence that may be probative when considered
together with the elements of the prima facie case." *Id.*   The
same evidence that called into doubt Rite Aid's proffered
reason(s) for terminating Brandon is relevant here.   Brandon's
own testimony that Rite Aid's holiday workweek policy was, in
fact, far more flexible than Rite Aid suggests, is evidence that
tends to suggest "the proffered reason ha[s] no basis in fact"
and is pretextual.

### B.   <u>Retaliatory Termination Claim.</u>

Brandon's second claim is that she was terminated because
she exercised her protected right to complain about sex
discrimination.   The *McDonnell Douglass* burden shifting approach
applies to claims of retaliation, although the prima facie
elements are different.

### 1.   Prima Facie Case

To make out a prima facie case for retaliatory discharge, a
plaintiff must show that (1) she engaged in a protected activity;
(2) was subject to an adverse employment action; and (3) there
was a causal link between the two.   *Flait v. North Am. Watch
Corp.*, 3 Cal. App. 4th 467, 476 (1992).

Again, it is not disputed that Brandon engaged in protected

**29**

activity and was subjected to an adverse employment action. (Doc. 25 at 15.)  It is also not disputed that Brandon filed a charge of sex discrimination with the California Department of Fair Employment and Housing on December 5, 2005.  (PUF #3.)  The charge was mailed to Rite Aid's Human Resources Manager, Daniel Pina, on December 6, 2005.

The crux of the dispute here concerns the third element: causation.  Plaintiff argues that the closeness in time between the filing of her complaint and her termination, as well as the fact that the individual to whom her complaint was mailed (Pina) was involved in her termination, are sufficient to meet her prima facie burden.  Temporal proximity along with knowledge by the employer of the protected activity can satisfy the causation requirement:

> A causal link may be established with evidence demonstrating that the employer was aware of the protected activity and the adverse action followed within a relatively short time.

*Gemini Aluminum*, 122 Cal. App. 4th at 1020.

### a.    Rite Aid's knowledge of Brandon's Discrimination Complaint.

To establish causation in a retaliation case, Plaintiff must "make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity."  *Raad v. Fairbanks N. Star Borough Sch.*

*Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003).

Here, it is not disputed that Brandon filed a charge of sex discrimination with the California Department of Fair Employment and Housing on December 5, 2005. (PUF #3.)  The charge was mailed to Rite Aid's Human Resources Manager, Daniel Pina, on December 6, 2005.  Within three weeks of filing the charge, Brandon was suspended and ultimately terminated. (*Id.*)  Although Brandon has not produced evidence demonstrating that Pina received the complaint, Pina does not deny receiving it, nor does he deny having knowledge of Brandon's DFEH complaint. (*See* Pina Decl., Doc. 30.)

Rite Aid rejoins by emphasizing that the ultimate decision to terminate Brandon was made by Houston, not Pina, and that there is no evidence that Pina informed Houston of Brandon's protected activity.  But, Houston "consulted with" Pina about the appropriate disciplinary action that should be taken against Brandon (UF #82).[8]  Pina was involved in the termination decision and it can be inferred that he had knowledge of Brandon's

---

[8]     Pina was also involved in the December 2002 disciplinary actions that led to Brandon's termination.  When Boesch first began to assert that Brandon's schedule was not in compliance with the holiday workweek policy, he informed Pina of the problem. (UF #67.)  Pina called Brandon to discuss her compliance and to explain the policy.  Brandon attempted to explain why she was not there, but Pina cut her off. (UF #681; Brandon Depo. at 254-56.)

complaint at the time of his involvement.

### b.   Temporal Proximity.

"When adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred." *Passatino v. Johnson & Johnson Consumer Products Inc.*, 212 F.3d 493, 507 (9th Cir. 2000).  Time lapses of as much as three months between protected activity and adverse action are short enough to allow an inference of causation. *See Yartzov v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).  Here, approximately three weeks passed between the filing of Brandon's complaint and her termination at the end of December 2002.

Many other Ninth Circuit cases, including *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107(9th Cir. 2003) and *Bell v. Clackamas County*, 341 F.3d 858, 866 (9th Cir. 2003), have held that temporal proximity of approximately one month is sufficient to establish causation.  Defendant attempts to distinguish these cases by pointing out that "in all those cases the plaintiffs denied committing the infractions."  This distinction is not persuasive.  Although Brandon does not deny her conduct, she does deny that her conduct violated company policy.

//

//

**2.   Legitimate Non-Discriminatory Reason.**

As discussed above, supra at Part V.A.2, the legitimacy of Rite Aid's proffered non-discriminatory reason for Brandon's termination is in dispute.  Accordingly, it is not appropriate to shift the burden back to Plaintiff to establish pretext.

**3.   Plaintiff's Showing of Pretext.**

Once again, because Rite Aid has failed to satisfy its burden of proof as to a legitimate non-discriminatory reason for Brandon's termination, Brandon is not required to establish pretext in order to survive this motion for summary judgment.  But, even if, arguendo, the burden did shift back to Brandon, she may satisfy this burden by showing "that the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate discharge."  *Gemini Aluminum,* 122 Cal. App. 4th at 1023.  While "an inference of intentional discrimination cannot be drawn solely from evidence showing the employer to be unworthy of credence, it is circumstantial evidence that may be probative when considered together with the elements of the prima facie case."  *Id.*  Temporal proximity is also relevant to the pretext analysis.  *Id.* ("Pretext may also be inferred form the timing of the company's termination decision....").

Here, as discussed above, Plaintiff's own testimony suggests

**33**

that Rite Aid's proffered basis for terminating her may be

unworthy of credence in the absence of a valid holiday workweek

policy applicable to store managers.   Moreover, the termination

followed closely her sex discrimination complaint.   Taken

together, this evidence is sufficient to establish pretext and to

require a trial.


   **C.   Punitive Damages**

     Defendant moves in the alternative for summary adjudication

of Plaintiff's claim for punitive damages.     Plaintiff does not

respond to this motion in her opposition.

     Plaintiff's claims for exemplary damages are based on

California law.   California Civil Code § 3294(b), which provides

as to claims brought against a corporate employer:

>              An employer shall not be liable for [punitive] damages
>              ... based upon acts of an employee of the employer,
>              unless the employer had advance knowledge of the
>              unfitness of the employee and employed him or her with
>              a conscious disregard of the rights or safety of others
>              or *authorized or ratified* the wrongful conduct for
>              which the damages are awarded or was personally guilty
>              of oppression, fraud, or malice. With respect to a
>              corporate employer, the advance knowledge and conscious
>              disregard, authorization, ratification or act of
>              oppression, fraud, or malice *must be on the part of an
>              officer, director, or managing agent of the
>              corporation*.

(emphasis added).   Section 3294(c) defines the terms "malice,"

"oppression," and "fraud":

**34**

(1) "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.

(2) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.

(3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

To recover punitive damages under this provision, Brandon must establish by clear and convincing evidence that Rite Aid acted with "oppression, fraud, or malice" toward her. *Aquino v. Superior Court*, 21 Cal App. 4th 847, 857 (1993).[9]  This higher

---

[9]    The Ninth Circuit also demands an almost certain showing of intent to justify an award of punitive damages under Title VII.

An award of punitive damages under Title VII is proper where the acts of discrimination giving rise to liability are willful and egregious, or display reckless indifference to the plaintiff's federal rights. In such circumstances, society has a strong interest in punishing the tortfeasor, and exemplary damages are most likely to deter others from undertaking similar actions. Punitive damages may not be awarded, however, where a defendant's discriminatory conduct is merely "negligent in respect to the existence of a federally protected right," Hernandez-Tirado, since society's interest in punishing the tortfeasor is substantially reduced in such cases, and the deterrent effect of exemplary damages is likely to be much weaker. Thus, to be entitled to an award of punitive damages, the plaintiff must demonstrate that the defendant "almost certainly knew that what he was doing was wrongful and subject to punishment.

35

standard of proof applies at all stages of the proceeding, including at summary judgment.  *Adams v. Allstate Ins. Co.*, 187 F. Supp. 2d 1219, 1231 (C.D. Cal. 2002).  "When dealing with a corporate employer, a plaintiff must also show that the employer's officer, director or managing agent had advance knowledge of the oppressive, malicious or fraudulent act and consciously disregarded, authorized or ratified it."  *Reid v. SmithKline Beecham Corp.*, 366 F. Supp. 2d 989, 1001 (S.D. Cal. 2005)(citing section 3294(b)).[10]

Here, the critical inquiry is whether Plaintiff has submitted "clear and convincing evidence" from which a trier of fact could find that Rite Aid acted with conscious disregard for her rights.  Rite Aid claims she consciously violated the holiday workweek policy while holding a second job.  Plaintiff's evidence that discriminatory intent motivated her termination consists of her own testimony concerning the holiday workweek policy, and a speculative comparison between her conduct and Jim Crabtree's.  Plaintiff's retaliation claim also turns on her own understanding of the holiday workweek policy, as well as circumstantial temporal proximity evidence.  Viewing the evidence in a light

---

*Ngo v. Reno Hilton Resort Corp.*, 140 F.3d 1299, 1304 (9th Cir. 1998).

[10]    Whether any of the Rite Aid employees involved in Brandon's termination qualify as an "officer, director or managing agent" is not clear.  However, Defendants do not squarely raise this issue in their motion.

most favorable to Plaintiff, Brandon's interpretation of the holiday workweek policy must be accepted for the purposes of this motion, in the absence of definitive contrary evidence.  If a trier of fact found Rite Aid's purported 10 hour/6 day workweek policy to be a fabrication evidencing a post-hoc effort to justify Brandon's termination, Brandon's version of the facts would constitute clear and convincing evidence of a "willful and conscious disregard" for Brandon's rights.  Rite Aid's motion for summary adjudication of Brandon's claim for punitive damages is **DENIED WITHOUT PREJUDICE.**

## VI.   CONCLUSION

For the reasons set forth above, Defendant Rite Aid's:

(1)   Motion for summary judgment on Plaintiff's discriminatory discharge claim is **DENIED;**

(2)   Motion for summary judgment on Plaintiff's retaliation claim is **DENIED;** and

(3)   Motion for summary adjudication on Plaintiff's claim for punitive damages under California Civil Code § 3294(b) is **DENIED WITHOUT PREJUDICE.**

Dated: January 5, 2006            /s/ OLIVER W. WANGER
                                  **OLIVER W. WANGER**
                                  **United States District Judge**

37